## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

CLIFTON Z. FREEMAN, JR.,

     Plaintiff,

v.

BRENDA JOY BENSON, et al.,

     Defendants.

Case No. 16-3127-DDC-TJJ

## MEMORANDUM AND ORDER

On June 15, 2016, pro se[1] plaintiff Clifton Z. Freeman, Jr. brought this *Bivens*[2] action against defendants Brenda Benson, Joseph Bleier, Jason Wells, Claude Maye, Joseph Wilson, and John/Jane Doe. Plaintiff's Complaint alleges that defendants violated his First, Sixth, and Fourteenth Amendment rights, and he seeks a declaratory judgment and monetary damages for these violations. Doc. 1 at 19–25. On January 3, 2017, Judge Sam A. Crow entered a Screening Order (Doc. 12) under 28 U.S.C. § 1915A. In that Order, Judge Crow dismissed defendant John/Jane Doe without prejudice and dismissed plaintiff's Sixth and Fourteenth Amendment claims without prejudice. Doc. 12 at 12.

Now, defendants Brenda Benson, Joseph Bleier, Jason Wells, Claude Maye, and Joseph Wilson have moved to dismiss this action for lack of subject matter jurisdiction under Rule

---

[1] Because plaintiff proceeds pro se, the court construes his pleadings liberally and holds them to a less stringent standard than those drafted by lawyers. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the court does not assume the role of advocate for plaintiff. *Id.* Nor does plaintiff's pro se status excuse him from complying with the court's rules or facing the consequences of noncompliance. *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

[2] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

12(b)(1) of the Federal Rule of Civil Procedure or for failing to state a claim upon which relief can be granted under Rule 12(b)(6). Alternatively, defendants move the court to grant summary judgment under Rule 56. For reasons discussed below, the court grants defendants' motion to dismiss. Alternatively, the court concludes that even were it to deny defendants' Rule 12(b) motion, it would still conclude the case by granting summary judgment against all plaintiff's claims.

## I.    Motion to Dismiss

Plaintiff alleges First Amendment retaliation claims against all defendants. Defendants assert that plaintiff fails to state a claim upon which relief may be granted. The court considers defendants' dismissal argument below.

### A.    Alleged First Amendment Retaliation

The Complaint alleges that Dr. Brenda J. Benson, former coordinator for the Residential Drug Abuse Program ("RDAP") at U.S. Penitentiary ("USP") Leavenworth, filed false disciplinary charges against plaintiff as punishment for his filing of repeated complaints against her and for making unflattering remarks about her in e-mail correspondence dispatched to non-inmates. Plaintiff alleges that Dr. Benson did so to have him placed in punitive segregation. Such punishment forfeited his § 3621(e)[3] early release eligibility.

Plaintiff's Complaint also alleges that Claude Maye, former Warden of USP Leavenworth, participated in Dr. Benson's alleged retaliatory conduct by allowing plaintiff to remain in punitive segregation for 13 days. Plaintiff alleges that Warden Maye knew or should have known about Dr. Benson's desire to retaliate against plaintiff.

---

[3]    18 U.S.C. § 3621(e) provides: "The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve." § 3621(e)(2)(B)

The Complaint also alleges that Joseph Wilson, Unit Disciplinary Committee ("UDC") Chairman at USP Leavenworth, participated in retaliatory conduct when he informed plaintiff that the UDC had found plaintiff committed the prohibited act of insolence towards a staff member, and sanctioned plaintiff with 30 days loss of commissary, phone, and visiting privileges. Plaintiff also alleges that Mr. Wilson denied plaintiff's appeal from the UDC decision.

Finally, plaintiff's Complaint alleges that Dr. Joseph Bleier and Dr. Jason Wells participated in the retaliatory acts when they colluded with Dr. Benson to expel plaintiff from RDAP.

### B.    Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Under this standard, 'the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual

support for *these* claims.'" *Carter v. United States*, 667 F. Supp. 2d 1259, 1262 (D. Kan. 2009) (quoting *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).

On a motion to dismiss like the one presented here, the court assumes that a complaint's factual allegations are true, but need not accept mere legal conclusions as true. *Id.* at 1263. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not enough to state a claim for relief. *Iqbal*, 556 U.S. at 678.

### C.    Analysis

Since *Bivens* recognized an implied private right of action for damages against federal officials who violate a citizen's Fourth Amendment rights, it has extended *Bivens* only to reach Equal Protection Clause claims and "deliberate indifference" claims under the Eighth Amendment. *Ingram v. Faruque*, 728 F.3d 1239 (10th Cir. 2013) (citing *Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980). Indeed, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001). Relevant to plaintiff's claims here, the Supreme Court specifically has refused to recognize a *Bivens* claim for alleged First Amendment violations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (noting that the Supreme Court has "declined to extend *Bivens* to a claim sounding in the First Amendment"); *see also Bush v. Lucas*, 462 U.S. 367, 390 (1983) (declining to extend *Bivens* to First Amendment retaliation claim). District courts thus have dismissed prisoner First Amendment retaliation claims under *Bivens* for failing to state a claim. *See, e.g.*, *Mochama v. Zwetow*, No. 14-2121-KHV, 2017 WL 36363, at *11 (D. Kan. Jan. 3, 2017); *Williams v. Klien*, 20 F. Supp. 3d 1171, 1175 (D. Colo. 2014); *Hall v. Shumard*, No. 15-cv-01949-RBJ-MJW, 2017 WL 694589, at *2 (D. Colo. Feb. 21, 2017).

Consistent with this precedent, the court dismisses plaintiff's First Amendment claims because they fail to state a claim for relief as a matter of law. The court could end its analysis here, but other reasons lead to a similarly decisive outcome. Namely, even if *Bivens* included a First Amendment retaliation claim, the undisputed material facts warrant summary judgment against that claim. Part II of this Order provides the summary judgment analysis supporting this conclusion.

## II.    Motion for Summary Judgment

Because defendants alternatively moved for summary judgment, they provided—and referenced—matters outside the pleadings in that aspect of their motion and supporting papers. *See* Docs. 42, 48. Plaintiff also provided matters outside the pleadings in his Response to defendants' Motion. *See* Doc. 47. The court considered those matters for the analysis below so the court treats it as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). Also, all parties were given a reasonable opportunity to present all the material pertinent to defendant's motion because plaintiff responded to that motion and defendants replied. *See id.* ("All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.")

A.    **Uncontroverted Facts[4]**

The following facts govern this motion and are uncontroverted or, where controverted,

are recited in the light most favorable to the plaintiff, the party opposing summary judgment.

*Scott v. Harris*, 550 U.S. 372 378 (2007).

1.    **Retaliatory Acts**

On September 13, 2015, plaintiff wrote an email to a non-inmate that included the

following message:

> . . . that racist bitch [Dr. Benson] set me back 60 days, I told her dirty ass,
> however, that she would likely suffer a pyrrhic victory behind fucking with me
> because it was now my turn and I write a mean complaint . . . she was just too
> nefariously pompous, just an evil little racist ass White woman . . . I am happy
> about that, to see her go and to know that she'll never forget my name for as long

---

[4]    Plaintiff's "Declaration in Opposition to Defendants' Motion for Summary Judgement" (Doc. 47 at 5–25) does not comply with D. Kan. Rule 56.1. This rule provides:

(1) A memorandum in opposition to a motion for summary judgment must begin with a section containing a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute must be numbered by paragraph, refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed.

(2) If the party opposing summary judgment relies on any facts not contained in movant's memorandum, that party must set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by subsection (a), above. All material facts set forth in this statement of the non-moving party will be deemed admitted for the purpose of summary judgment unless specifically controverted by the reply of the moving party.

D. Kan. Rule 56.1(b). Plaintiff has not complied with this rule.

Plaintiff has titled part of his Response as a "Statement of Genuine Disputes of Material Fact by Opposing Party." But instead of controverting defendants' factual allegations in the fashion required by this rule, plaintiff merely lists legal issues. Elsewhere, plaintiff alleges facts, but does not controvert defendants' factual allegations by referring to those portions of the record with particularity. Because plaintiff proceeds pro se, the court has examined plaintiff's filing thoroughly to determine whether genuine issues of material fact exist. *See Jackson v. Yellow Logistics, Inc.*, 24 F. Supp. 2d 1206, 1209 (D. Kan. 1998). To the extent plaintiff has supported his factual contentions with admissible evidence, the court has incorporated them in its statement of uncontroverted facts.

> as she lives . . . She was just too fucking nefariously evil and pompous and certainly needed to find humility or better yet, I made sure humility found her. . . .

Doc. 43-6 at 3. After Dr. Benson saw the email on September 15, 2015, she prepared an incident report against plaintiff for violating: (1) Disciplinary Code 307, Refusing to obey and order; (2) Code 312, Insolence towards a staff member; and (3) Code 203, Threatening. Dr. Benson previously had instructed plaintiff to stop using derogatory language towards staff in his emails because it was inconsistent with RDAP. Doc. 1-1 at 7. Thus, plaintiff knew that Dr. Benson was monitoring his email.

That same day, plaintiff submitted a request for administrative remedy against Dr. Benson. Two hours later, Dr. Benson approached him and said: "I finally got your 'ass' like I told you I would. Oh well, you won't be graduating after all. You need to report to the Lieutenant's Office right now." When plaintiff reported to the Lieutenant's Office, he was seized, stripped of his personal property, placed in punitive segregation, and issued the incident report authored by Dr. Benson alleging institutional violations.

Eight days later, on September 23, 2015, plaintiff asked Warden Maye how long he would remain in punitive segregation on false charges. In response, Warden Maye allegedly said that plaintiff was not falsely charged and that plaintiff should expect punishment when he writes derogatory things about prison staff in outside communications.

The next day, Joseph Wilson, Unit Disciplinary Committee Chairman, told plaintiff that the UDC had found plaintiff guilty of insolence towards a staff member and sanctioned him with loss of phone, commissary, and visiting privileges for 30 days. He also informed plaintiff that he had been expelled from RDAP and his § 3621(e) early release credit had been forfeited. *See* n.3, above. Plaintiff asked to submit documentary evidence in his defense. But, Mr. Wilson refused to review the documentary evidence because plaintiff already had been found guilty of insolence.

Case 5:16-cv-03127-DDC-TJJ    Document 53    Filed 11/28/17    Page 8 of 23

Mr. Wilson also told plaintiff that Dr. Benson could censor plaintiff's non-threatening email correspondence with plaintiff's family.

According to a form signed on September 25, 2015 by Dr. Jason Wells, plaintiff was expelled from RDAP seven days before he was scheduled to graduate from the program. Dr. Wells wrote that plaintiff was expelled for lack of progress and that plaintiff already had received a behavioral contract and formal warning, but continued to display some of the same behaviors. Doc. 1-1 at 9, 15. Plaintiff had never met Dr. Wells.

On September 28, 2015, plaintiff was released back into the prison's general population after 13 days in punitive segregation. Plaintiff appealed the UDC actions and his expulsion from RDAP to Unit Manager J. Johnson. Manager Johnson did not conduct the appeal; instead, Unit Manager Joseph Wilson, who conducted the UDC hearing that plaintiff was appealing, reviewed and investigated plaintiff's appeal.

On December 11, 2015, plaintiff met with Dr. Joseph Bleier, Chief of Psychology, to resolve an administrative grievance informally. Dr. Bleier reacted negatively to plaintiff's statements about Dr. Benson and informed plaintiff that he had lost his First Amendment rights when he signed up for RDAP. Dr. Bleier also informed plaintiff that he was found guilty of insolence towards a staff member, which violated the terms of the behavioral contract that he signed as an RDAP requirement. Plaintiff had signed that contract reluctantly under the threat that he would be expelled from RDAP if he did not sign. Dr. Bleier refused to consider reinstating plaintiff in RDAP. The Bureau of Prisons Regional Director later told plaintiff that he could reapply to participate in RDAP. Plaintiff met with Dr. Bleier on February 29, 2016, to discuss the option of resuming the final phase of RDAP. Dr. Bleier again refused to consider reinstating plaintiff.

### 2.    Administrative Remedy Requests

Plaintiff has filed five administrative remedy requests that matter to plaintiff's claims here—numbered 826124, 836763, 836759, 841605, and 872341.  He exhausted his administrative remedies for each of the issues he raised in them.

### i.    826124

In Request for Administrative Remedy 826124, plaintiff requested a remedy for three issues.  First, plaintiff alleged that on June 3, 2015, Dr. Benson and "DTSs" "vehemently accosted and berated" him for comments he made about the staff in an RDAP assignment.  In one portion of that 10-page assignment, plaintiff referred to some of the USP Leavenworth staff as "racist xenophobes."  Plaintiff asserted that this and other comments in the assignment caused Dr. Benson "to explode[] into a tirade."  Doc. 43-2 at 68.  During this meeting about his assignment, plaintiff was told he had to complete Core Phase of RDAP again—adding three months to his time in the program.  Next, plaintiff alleged that Dr. Benson informed him on June 5, 2015 that she was reading his emails and "admonished" him for referring to her and other staff in a "negative light."  Last, plaintiff alleged that on June 8, 2015, he was given a RDAP Behavioral Contract as punishment.

Plaintiff was "dissatisfied" with the Warden's response to this administrative request, so he appealed to the Regional Director and then on to the Central Office.   In their responses to plaintiff's grievances, both the Warden and the Regional Director referenced RDAP Program Statement 5330.11.  It requires an inmate to demonstrate progress to advance through the phases of the program.  The Central Office's response concurred with the responses provided by the Warden and Regional Director.

### ii.    836763

On September 10, 2015, plaintiff filed Request for Administrative Remedy 836763.  It sought a remedy because Dr. Benson allegedly had shared information about Remedy Request 826124 with another inmate.  Plaintiff received responses from each level, and plaintiff exhausted his appeals at the Central Office level.  The Central Office response stated that the Warden and Regional Director adequately had addressed the issues he raised—and denied further investigation because plaintiff failed to provide any corroborating evidence.

### iii.    836759

Plaintiff sought a second administrative remedy on September 10, 2015.  In Request 836759, plaintiff alleged that prison staff "shook his cell down" as retaliation for requesting administrative remedy.  The Warden responded that an investigation was conducted and it concluded that the staff was ensuring proper cell sanitation.  Plaintiff appealed to the Regional Director and Central Office.  The Central Office determined that plaintiff's allegations were unsubstantiated.

### iv.    841605

In Remedy Request 841605, plaintiff complained about the events of September 15, 2015, involving Dr. Benson and the ensuing punitive segregation described, above.  *See* Part II.A.1 at 7. Plaintiff also addressed the events of September 24, 2015 with Mr. Wilson, also described above.  *Id.*  Plaintiff exhausted his appeals at the Central Office once again.  The Central Office noted that the incident report resulting from the September 13, 2015 email had been expunged so no further relief was warranted.

### v.    872341

On August 5, 2016, plaintiff requested a remedy for his expulsion from RDAP.  Plaintiff appealed through the Regional Director to the Central Office.  Neither party submitted the Central Office's response to this appeal.  But, the Regional Director responded that plaintiff could seek reinstatement by reapplying to RDAP 90 days after his expulsion.

### B.    Rule 56 Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."  *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

C.    **Analysis**

Defendants assert that the court should grant summary judgment against plaintiff's claims for four reasons: (1) plaintiff has failed to exhaust administrative remedies about Warden Maye; (2) qualified immunity bars plaintiff's claims seeking to recover damages against all defendants; (3) no vicarious liability is available under plaintiff's legal theory, and (4) no declaratory judgment is available.

1.    **Plaintiff Failed to Exhaust Administrative Remedies**

The Complaint alleges First Amendment retaliation against Warden Maye for time that plaintiff spent in punitive segregation. Defendants argue that plaintiff has failed to exhaust his administrative remedies and so he cannot sue on this claim. Plaintiff fails to rebut this argument with any admissible evidence. Instead, he argues that the "PLRA's exhaustion requirement does not require an inmate to exhaust as to every allegedly guilty individual." Doc. 47 at 22. Plaintiff is mistaken.

The Prison Litigation Reform Act of 1995 ("PLRA") requires prison inmates to exhaust all available administrative remedies before commencing a *Bivens* action. *See* 18 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 525 (2002). If an inmate fails to pursue a claim through the entire administrative remedy process, that claim is subject to dismissal. *Watson v. Evans*, No. 13-cv-3035-EFM, 2014 WL 7246800, at *4 (D. Kan. Dec. 17, 2014) (citing *Jones v. Bock*, 549 U.S. 199, 211 (2007)). Exhaustion is an affirmative defense that defendants must raise. *Jones*, 549 U.S. at 216.

Defendants concede that plaintiff has exhausted his administrative remedies properly on the issues of inmate discipline, expulsion from and reinstatement in RDAP, and complaints of staff retaliation. Doc. 43 at 25. But, relying on plaintiff's administrative remedy history, defendants assert that plaintiff has failed to exhaust the administrative remedy process on his issues with Warden Maye and his punitive segregation punishment. *Id.*; Doc. 43-2 at 32–106.

The administrative remedy process available to inmates in federal custody is the BOP's Administrative Remedy Program. 28 C.F.R. § 542.10(a). Under this program, an inmate first must present the issue to staff for informal resolution. § 542.13. If unsuccessful at that stage, the inmate may then submit a formal written remedy request to the Warden. § 542.14. An inmate has 20 days from the date of the incident to submit a request to the Warden. *Id.* If the inmate is unsatisfied with the Warden's response to his request, he may appeal to the appropriate Regional Director, and then finally to the Director, National Inmate Appeals, in the Bureau of Prison's Office of the General Counsel. § 542.15(a). Where an inmate reasonably believes an issue is a sensitive one and would endanger his safety or well-being if its substance were widely known, the inmate may submit his initial request directly to the Regional Manager instead of the

Warden. § 542.14(d).  The Regional Manager may accept the request or may advise the prisoner to initiate the remedy process at the local level. *Id.*

Plaintiff never initiated any request for an administrative remedy about Warden Maye. All of plaintiff's references to punitive segregation (or the "SHU") in his remedy requests allege that Dr. Benson was responsible for his placement there.  The court thus finds that plaintiff has failed to exhaust his administrative remedies on issues he has with Warden Maye.  Accordingly, the court grants summary judgment against plaintiff's claim against Warden Maye.

## 2.    Defendants Have Qualified Immunity

Defendants also contend that qualified immunity protects them from suit and liability on plaintiff's claims.  Plaintiff has alleged First Amendment Retaliation claims under *Bivens* against all defendants for actions they took in response to plaintiff's September 13, 2015 email.  But, defendants assert, they violated no clearly established right when they acted on this email.

*Bivens* subjects federal officials to individual liability for monetary damages when they violate a constitutional right under color of federal authority.  403 U.S. at 391.  But, qualified immunity provides a defense to such actions in certain situations.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Indeed, this immunity is "an *immunity from suit* rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (citation omitted) (emphasis in original).  At summary judgment, qualified immunity protects federal officials from monetary damages unless the summary judgment facts would permit a jury finding (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  "If the plaintiff fails to carry either part of his two-part

burden, the defendant is entitled to qualified immunity." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995).

District Courts have the discretion to decide which of the qualified immunity two prongs to analyze first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The qualified immunity analysis here begins by considering whether a constitutional right was clearly established. It was not.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Howards*, 566 U.S. at 664 (internal quotations and citation omitted). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citation omitted). The clearly established right "must be particularized to the facts of the case" and not defined "at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010).

The court finds no clearly established right particularized to the facts of this case. Plaintiff asserts that he, as a prison inmate, has a First Amendment right to be free from censorship when asserting unflattering and unwelcome opinions, or making factually inaccurate statements about prison officials to non-inmates in outgoing correspondence. Doc. 47 at 5, 20–21. The Supreme Court and the Tenth Circuit have recognized that prisoners have a clearly established First Amendment right of this character. But, they have not recognized that right on facts that are "particularized to the facts of this case." *See White*, 137 S. Ct. at 552. The particular facts of this case establish that plaintiff's September 13, 2015 email contained vulgar

15

and derogatory insults directed to a prison employee.  The Supreme Court and the Tenth Circuit have not recognized that prisoners have a clearly established First Amendment right to make such insults to prison employees.

Instead, the Supreme Court broadly has held that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  In *Pell*, the controlling rationale in the Court's decision was that the "[p]rison administrators had reasonably exercised their judgment as to the appropriate means of furthering penological goals."  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (citing *Pell*, 417 U.S. at 826–27).  Consequently, courts afford "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."  *Id.*

More narrowly tailored to the current issue, the Supreme Court has held that various considerations may justify censorship of outgoing prisoner correspondence.  *Procunier v. Martinez*, 416 U.S. 396, 414 (1974) *overruled in part on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989) (overruling *Martinez* as applied to incoming correspondence, but not outgoing correspondence).  To justify censorship, prison officials must show that the "censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation."  *Id.*  Censorship may not be used "simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements."  *Id.*

Our Circuit likewise has held that prison officials may not punish inmates for correspondence unless the correspondence impinges on important governmental interests of security, order, and rehabilitation.  *Gandy v. Ortiz*, 122 F. App'x 421, 423 (10th Cir. 2005).  "If

prison officials cannot censor unflattering statements made in letters to outsiders, they also may not punish an inmate for the contents of such letters." *Id.* Thus, correspondence is not punishable unless it is censorable. *See id.* In *Gandy*, the prisoner plaintiff sent a letter to Home Depot alleging that the prison was instituting a program that would encroach on Home Depot's business. *Id.* at 422. When the letter was returned undeliverable, the prison staff confiscated it and punished the prisoner author for violating the prison's code of penal discipline. *Id.* His punishment included punitive segregation, suspension from his paid work assignment, and an increase in his security classification. *Id.* The prisoner sued, alleging violation of his First Amendment rights under 42 U.S.C. § 1983. The district court dismissed the complaint under 28 U.S.C. § 1915(e). *Id.* at 421–22. But, the Tenth Circuit reversed, holding that that the prisoner plaintiff had "stated a claim that the conduct which led to the alleged retaliation was constitutionally protected and that the disciplinary action taken against him violated his clearly established constitutional rights." *Id.* at 423.

In contrast, other circuits have found no First Amendment violation when outgoing correspondence was censorable. The Eighth Circuit concluded, "[W]hen a prisoner is not sending legitimate personal correspondence, defamatory comments that are directed at the warden and prison staff through the guise of [legitimate outgoing] communication properly subject the prisoner to discipline to preserve the prison's penological interest in order, and that [prisoner's] discipline does not violate the First Amendment." *Leonard v. Nix*, 55 F.3d 370, 376 (8th Cir. 1995). In *Leonard*, the Eighth Circuit found that prison officials did not violate a prisoner's First Amendment rights by disciplining him for sending correspondence containing "diatribes directed at and toward the warden and the prison staff as a vehicle of protest." *Id.* at 374. The prisoner plaintiff had written multiple vulgar letters addressing the African-American

warden, Mr. Nix. *Id.* at 371. His letters included: "They really got p---ed off for me calling [Warden Nix] a N-----. Ha."; "F--- THAT BLACK B------ AND HIS F---ING MERRY LITTLE BAND"; and "The chief n----- and his WHITE BOY gang will go down in flames. Ha." *Id.* at 371–372 (brackets and abbreviations in original). The prisoner knew that prison staff was reading his letters. *Id* at 372. The prisoner was disciplined for the letters and he filed two actions alleging that the prison staff had violated his First Amendment rights. *Id.* The district court found no First Amendment violation, and the Eighth Circuit affirmed this holding. *Id.* at 371. It reasoned:

> There is little doubt that the same language, if spoken by [plaintiff] directly to the warden, would result in justifiable disciplinary action to preserve discipline and order. There is also little doubt that [plaintiff] is attempting to use this court not as a means of protecting his right to engage in the free interchange of ideas, which is the founding purpose of the First Amendment's guarantee of free speech, but as a means of ensuring for himself the special privilege of directly attacking the warden with written racial epithets without disciplinary consequence.

*Id.* at 375 (citation omitted).

The Seventh Circuit also has upheld disciplinary action against a prisoner's claim of a First Amendment violation. The prisoner had sent outgoing correspondence. *Carroll v. Tucker*, 17 F. App'x 392, 393 (7th Cir. 2001). The Seventh Circuit held that the discipline imposed by the prison for violating a legitimate prohibition against insolence comported with the First Amendment. *Id.* The challenged discipline resulted from a letter he had written to his wife. Among others, it included this passage:

> Since the nosy fags in the mail room are reading my mail, (spot checkn [sic] as they call it), All I can say is to deal with a different Company that these assholes can varify [sic] is legit! . . . Since I got a ticket for stating in one of my letters Assistant Asshole Nigger Warden Hinsley I thought I would say it again. One more time: Assistant Asshole Nigger Warden Hinsley. Now issue two more tickets you nosy assholes reading my mail.

*Id.* The plaintiff received a disciplinary report for insolence and was placed in segregation for one month. *Id.* The inmate then filed suit under 42 U.S.C. § 1983. *Id.* After the district court granted summary judgment against his claim, he appealed and the Seventh Circuit affirmed. *Id.* The Seventh Circuit analogized the letter to the one in *Leonard*, finding that the plaintiff had directed his derogatory insults at prison employees and, by doing so, he had violated a constitutionally legitimate regulation. *Id.* at 394.

In sum, the Supreme Court ruled in *Pell* that a prisoner retains some First Amendment rights. *Pell, supra.* In *Martinez*, the Supreme Court established a test for prisons to apply when censoring outgoing correspondence. *Martinez, supra.* Since *Martinez*, the Tenth Circuit has concluded that prison inmates have a clearly established constitutional right not to be punished for outgoing correspondence when the correspondence merely contains unflattering statements. *Gandy, supra.* But, other circuits have concluded that prison inmates have no clearly established right to send outgoing correspondence that is "in fact diatribes directed at and toward the warden and the prison staff as a vehicle of protest." *Leonard*, *supra.*

Here, plaintiff's e-mails more closely resemble the unprotected letters considered in *Leonard* and *Carroll* than they resemble the letter at issue in *Gandy*. Plaintiff was not simply telling an outside business that the prison was infringing on its business. *See Gandy*, *supra.* Like *Leonard* and *Carroll*, plaintiff knew Dr. Benson was reviewing his outgoing emails and used obscene language to refer to her in his September 13, 2015 email. And, as with the communications in *Leonard* and *Carroll*, plaintiff's email was a "diatribe" directed at Dr. Benson "as a vehicle for protest." Had plaintiff used those same terms to refer to Dr. Benson in person, prison officials lawfully could discipline him for doing so. The court concludes that

defendants' punishment of plaintiff furthered a substantial governmental interest of order in penal facilities.

The "clearly established standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." *Howards*, 566 U.S. at 664 (internal quotations, correction, and citation omitted). Qualified immunity gives officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft*, 563 U.S. at 743. "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In sum, controlling Supreme Court authority holds that the First Amendment protects some of a prisoner's communications. Our Circuit has held—albeit on facts not particularized to this case—that prisoners possess a First Amendment right to send unflattering communications about prison officials even if they contain factual inaccuracies. But, the Seventh and Eighth Circuits have held—and on facts closely particularized to the ones presented here—that the First Amendment does not protect a prisoner's communications when they consist of diatribes or obscenities about prison officials. The communications leading to plaintiff's punishment here fall on the unprotected side of this line. This conclusion entitles defendants to summary judgment on their qualified immunity defense because no clearly established right entitled plaintiff to send the communications leading to his punishment. Qualified immunity gave defendants "breathing room" to make reasonable judgments about unsettled legal questions— even if their judgments turn out to be mistaken ones.

The court holds that the undisputed material facts, even when viewed in the light most favorable to plaintiff, entitle defendants to qualified immunity. This conclusion entitles defendants to summary judgment against those claims.

### 3. No Vicarious Liability

Next, plaintiff alleges that the law permits the court to hold Warden Maye, Dr. Bleier, and Dr. Wells vicariously liable for constitutional violations committed by others. But, the court has determined that plaintiff possessed no clearly established constitutional right to engage in the conduct that produced his punishment. So, Warden Maye, Dr. Bleier, and Dr. Wells cannot be held vicariously liable for others' conduct. But, even if plaintiff could establish a constitutional violation, plaintiff has failed to establish an affirmative link between Warden Maye, Dr. Bleier, or Dr. Wells and an alleged constitutional violation.

Under *Bivens*, government officials, in general, are not vicariously liable for a subordinate's misconduct. *Watson*, 2014 WL 7246800, at *6 (citing *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006)). To hold a supervisor liable for his subordinate's constitutional violation, "the plaintiff must demonstrate an affirmative link between the supervisor and the violation." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (internal quotations and citation omitted). This "affirmative link" requirement has three related prongs: (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind. *Id.* "A plaintiff could establish the defendant-supervisor's personal involvement by demonstrating his personal participation, his exercise of control or direction, or his failure to supervise or his knowledge of the violation and acquiescence in its continuance." *Id.* (internal quotations, correction, and citations omitted).

Although plaintiff alleges that Warden Maye, Dr. Bleier, and Dr. Wells personally participated by encouraging, authorizing, or acquiescing in the retaliatory acts, he has come forward with no admissible evidence capable of supporting his conclusory allegations. No reasonable factfinder could find an affirmative link exists between Warden Maye, Dr. Bleier, or Dr. Wells and the alleged constitutional violation. This makes summary judgment against plaintiff's claims against Warden Maye, Dr. Bleier, and Dr. Wells proper for another reason.

### 4.    No Declaratory Relief is Available

In addition to monetary damages, plaintiff's Complaint requests declaratory relief. *See* Doc. 1 at 21–23. Because the court has dismissed his claims for failing to state a claim as a matter of law, he no longer has any grounds which could support declaratory relief. *See* Part I.C., *supra*.

But even if some of plaintiff's claims could survive, his request for declaratory relief could not. The undisputed summary judgment facts establish that the Bureau of Prisons has transferred plaintiff from USP Leavenworth—where his claims arose—to another Bureau of Prisons' facility. This fact renders request for declaratory judgment moot. *See Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997) (holding that where plaintiff was no longer under the control of the defendants' prison, "the entry of a declaratory judgment in [plaintiff's] favor would amount to nothing more than a declaration that he was wronged, and would have no effect on the defendants' behavior towards him" (citations omitted)); *see also Marrie v. Nickels*, 70 F. Supp. 2d 1252, 1259 (D. Kan. 1999) ("Generally, an inmate's transfer to another prison or release moots his request for declaratory or injunctive relief." (citations omitted)).

III.    **Conclusion**

For the reasons explained above, the court concludes that plaintiff's Complaint fails to state a claim upon which relief may be granted.  It thus dismisses plaintiff's claims under Rule 12(b)(6).  But even if the Complaint stated a plausible claim, the court would grant summary judgment against all of plaintiff's claims for the reasons explained here:  plaintiff has failed to exhaust administrative remedies for his claims against Warden Maye; plaintiff's claims against defendants Brenda Benson, Joseph Bleier, Jason Wells, Claude Maye, and Joseph Wilson are barred by qualified immunity; plaintiff's Complaint improperly seeks to impose vicarious liability on defendants; and declaratory relief is not proper as a matter of law.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Brenda Benson, Joseph Bleier, Jason Wells, Claude Maye, and Joseph Wilson's Motion to Dismiss or in the Alternative, for Summary Judgment (Doc. 42) is granted.

**IT IS SO ORDERED.**

**Dated this 28th day of November, 2017, at Topeka, Kansas**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**

23